# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DEBRA K. BRADY,

        **Plaintiff,**

v.                            **Civil Action No. 2:05CV36**
                                    **(The Honorable Robert E. Maxwell)**

JO ANNE B. BARNHART,
Commissioner of Social Security,

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying

Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.

The matter is awaiting decision on cross motions for summary judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Debra K. Brady ("Plaintiff") filed an application for DIB on December 10, 2002, alleging

disability since November 1, 2002, due to hypertension, thyroid disease, allergies, and acid reflux

disorder (R. 73-75). Plaintiff also noted her illnesses, injuries or conditions limited her ability to

work because she experienced headaches, dizziness, diabetes, fatigue (R. 86). Plaintiff's

applications were denied at the initial and reconsideration levels (R. 52-56, 57-58, 59-60). Plaintiff

requested a hearing, which Administrative Law Judge Randall Moon ("ALJ") held on March 30,

2004. Plaintiff, represented by counsel, Mary Beth Angotti, testified on her own behalf. Also

testifying was Vocational Expert Eugene Czuczman ("VE") (R. 306-87). On August 26, 2004, the ALJ entered a decision finding Plaintiff was not disabled (R. 20-27). On March 3, 2005, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6-9).

## II. STATEMENT OF FACTS

Plaintiff was born on November 5, 1956, and was forty-eight years old at the time of the administrative hearing (R. 73, 318). Plaintiff withdrew from school during the ninth grade, but she obtained a GED in 1985 (R. 324). In 2001, Plaintiff received a nurse's aid certification (R. 325). Her past relevant work included jobs as a security guard, sewing machine operator, medical assistant, companion, and cashier (R. 21, 87, 97). Plaintiff last worked full time on November 1, 2002, when she was laid-off from her job as a security guard (R. 87, 329). Plaintiff then worked part time as a receptionist and medical assistant at a medical clinic from March 2003 until July 2003; however, she alleged disability as of November 1, 2002 (R. 119, 123, 125, 131, 324, 326-27).

On July 2, 2001, Plaintiff was hospitalized at Davis Memorial Hospital with complaints of abdominal pain, fever, and shortness of breath. Steven Toney, M.D., noted Plaintiff's June 30, 2001, CT scan of her chest was negative. Dr. Toney's admitting impression was for abdominal pain with elevated liver enzymes and shortness of breath. Plaintiff's July 6, 2001, discharge diagnosis was for poorly functioning gallbladder, hypothyroidism, hypertension, and gastroesophageal reflux disease (R. 146).

On July 11, 2001, Plaintiff underwent a cholecystectomy and adhesiolysis at Davis Memorial Hospital. Joseph Noronha, M.D., found that in Plaintiff's gallbladder, there "seemed to be a little mass at it's [sic] tip, could be adenoma or a polyp. The liver did look a little pale but was smooth,

2

homogenous . . . . The visible small bowel was normal. There were very extensive adhesions around the umbilicus down into the pelvis . . ." (R. 176).

On September 27, 2001, Plaintiff presented to Davis Memorial Hospital Emergency Department with complaints of cough, trouble breathing, chest tightness, and congestion (R. 172). She was diagnosed with right otitis media and acute sinusitis (R. 173).

On October 20, 2001, Plaintiff presented to Davis Memorial Hospital Emergency Department and was diagnosed with acute asthmatic bronchitis, skin rash, and dyspnea (R. 168-69).

On November 30, 2001, Plaintiff was treated by Sam Roberts, M.D., for influenza, obesity, hypertension, and sinusitis (R. 190).

On January 25, 2002, Plaintiff returned to Dr. Roberts for hypertension, obesity, dermatitis, and hypothyroidism. Plaintiff reported she experienced "more energy" (R. 189).

On April 30, 2002, Plaintiff was treated by Dr. Roberts for sinus congestion headaches "at times." He noted Plaintiff was positive for hypertension, hypothyroidism, allergies, and obesity and had "situational problems." He prescribed Allegra and encouraged Plaintiff to exercise (R. 188).

On June 10, 2002, Plaintiff was examined by Mason T. Corder, D.O., for complaints of headaches and soreness in her neck. Dr. Corder diagnosed muscle contraction headaches and ordered an MRI of Plaintiff's head and neck (R. 199).

On June 24, 2002, Plaintiff underwent a MRI of her brain and a MRI of her "neck/orbit/face." The following impressions were noted: 1) "diffuse cerebral cortical atrophy unusual for a patient at this age. No other abnormality seen" and 2) sinusitis, normal neck, and symmetrical structures (R. 187).

On July 11, 2002, David Libell, M.D., a neurologist, examined Plaintiff based on the results

3

of her MRI. He opined her neurologic examination was normal. Her cranial nerves were intact. Plaintiff did have some "subjective decrease to hearing a tuning fork to the right side compared to the left." Dr. Libell found no abnormalities in either optic nerve. Plaintiff's strength was 5/5 throughout. She had normal sensation, reflexes, coordination, and gait. Dr. Libell opined there did "seem to be a bit more atrophy than [he] would like for a 45 year-old female." He noted the atrophy was diffuse and not localized to the frontal base of Plaintiff's brain. Dr. Libell compared Plaintiff's May 30, 2000, CT scan to the June 24, 2002, MRI and noted there was no change. He opined this fact made him "feel more comfortable that this [was] a stable condition and may actually be normal for her." He found Plaintiff's headaches were muscle tension headaches and prescribed Amitriptyline as treatment. Dr. Libell recommended Plaintiff seek treatment from an ears, nose, and throat specialist for unilateral hearing loss and an ophthalmologist for her right-eye vision impairment (R. 291).

On August 2, 2002, Plaintiff returned to Dr. Corder with complaints of a cold and bronchitis. He diagnosed sinusitis and cough and prescribed Robitussin with codeine, Tequin, and nasal spray. He advised Plaintiff to limit her use of over-the-counter drugs (R. 198).

On September 16, 2002, Plaintiff visited Dr. Corder to "'discuss some things.'" Dr. Corder noted Plaintiff's psychological, skin, HEENT, neck, cardiovascular, lungs, abdomen, extremity, and neurological examinations were within normal limits. Dr. Corder opined Plaintiff was obese. He diagnosed headache caused by muscle contractions (R. 196).

On November 18, 2002, Plaintiff informed Dr. Corder that she was "tired" and she thought her "'thyroid [was] out of whack.'" Dr. Corder ordered a thyroid profile of Plaintiff. She "requested Meredian 15." Dr. Corder diagnosed hypothyroidism (R. 195).

4

On November 22, 2002, Plaintiff presented to Dr. Corder with complaints of "lack of energy," a rash, and aching all over. He diagnosed menopause symptoms (R. 194).

On December 24, 2002, Plaintiff completed an Activities of Daily Living questionnaire (R. 109-13). Plaintiff noted she experienced difficulty sleeping at night because her allergies caused congestion and her allergy medication caused her to "sleep too much," to become agitated, and to cry. Plaintiff wrote she napped during the day due to the effects of her medication (R. 109). Plaintiff wrote she did not prepare breakfast, she prepared a sandwich for lunch, and she sometimes prepared "a good dinner," but her husband sometimes prepared the meal (R. 110).

Plaintiff noted she performed the following housework activities: laundry, vacuuming, dusting furniture, paying bills, mopping floors, washing dishes, and managing bank accounts. Plaintiff asserted her husband helped her "with most everything everyday" (R. 110).

Plaintiff noted she shopped for food, clothing, and medications once weekly and that she drove to or was driven on these outings by her husband. Plaintiff wrote that she read the newspaper for one-half hour per day, watched television for three to four hours per day, and listened to the radio for two hours per day. Plaintiff listed her hobbies as watching movies once per day, gardening once per week, and shopping once per week. Plaintiff noted her husband assisted with the gardening and shopping (R. 111).

Plaintiff asserted relatives and friends visited two or three times weekly, during which she would lie down. Plaintiff noted she visited others every other month and these visits lasted about two hours. Plaintiff asserted she left the house about once per week because she did not "feel like going out" as she was "too tired" and she was "depressed" (R. 112).

Plaintiff wrote she experienced difficulty concentrating when her "thyroid [was] not right";

became drowsiness every day; became "upset" and "emotional"; experienced difficulty following written instructions; became "aggravated"; and experienced forgetfulness (R. 112).

On February 5, 2003, Kip Beard completed an Internal Medicine Examination of Plaintiff for the West Virginia Disability Determination Service (R. 202-06). Plaintiff's chief complaints were for hypertension, allergies, hypothyroidism, back pain, and diabetes. Plaintiff informed Dr. Beard she had been "diagnosed with diabetes about three to four months ago and [was] treated with oral medication." Plaintiff stated her blood sugar was between 130 and 150. Plaintiff informed Dr. Beard she experienced coughing and wheezing for "several years" and had been diagnosed with asthmatic bronchitis, for which she was treated twice per year with a nebulizer in an emergency room. Plaintiff stated she had never smoked and that "perfumes, bleach, spring and fall weather, dust, mold, dogs and exhaust fumes" aggravated her wheezing. Plaintiff stated she had undergone skin testing and was positive for skin allergies (R. 202). Plaintiff informed Dr. Beard she had been diagnosed with hypothyroidism in 1999, but had "never undergone radioactive iodide therapy or surgery." Plaintiff stated she related her "weight gain, swelling, and difficulty breathing and increased sweating . . . [and] chronic fatigue . . . to her hypothyroid condition." Plaintiff stated medication helped improve her energy level and that she napped daily. Plaintiff also informed Dr. Beard that she had been diagnosed with hypertension in 1998 and was being treated for that condition with two medications. Plaintiff informed Dr. Beard that she had experienced lower back pain for several years, but had "not been evaluated or treated" for the condition. Plaintiff stated her back pain was exacerbated by riding in a car, standing, sitting, bending, stooping, or lifting. Plaintiff treated her pain with application of topical ointments and over-the-counter medications. Plaintiff informed Dr. Beard she had been diagnosed with gastroesophageal reflux disease in 1999, but had

6

never undergone endoscopy or an upper GI. Plaintiff treated this condition with Prilosec, which "help[ed]" her condition. Plaintiff reported she was medicated with Keflex, Erythromycin, Avalide, Aatenolol, Synthroid, Prevacid, Glucophage, Premarin, Allegra, Nasacort, and Albuterol (R. 203).

Dr. Beard observed Plaintiff was five feet, two-and-one-fourth inches tall and weighed one-hundred and eighty-five pounds. Dr. Beard noted Plaintiff was able to stand without assistance and ambulated with a normal appearing gait. Dr. Beard observed Plaintiff was able to rise from a seated position, step up and step down without difficulty. He noted Plaintiff was comfortable while seated and in the supine position. Dr. Beared opined Plaintiff "seem[ed] to have a depressed affect" (R. 204).

Dr. Beard's review of Plaintiff's systems revealed normal HEENT, neck, chest, cardiovascular, abdominal, extremities, cervical spine, arms, hands, ankles, feet, and neurologic examinations (R. 204-05). Dr. Beard found Plaintiff had "some mild genu valgus deformity and mild patellar crepitations" in her knees; however, flexion was one-hundred-ten degrees, extension was normal, and there was no tenderness, redness, warmth, swelling, effusion, or laxity present. Dr. Beard also observed Plaintiff's deep tendon reflexes were "2+ biceps, triceps and patella and 1+ Achilles" and that Plaintiff was able to heel walk, toe walk, and heel-to-toe walk and squat (R. 205).

Dr. Beard found the following impression: 1) chronic cough and wheezing (possible asthma); 2) diabetes mellitus type II; 3) hypertension; 4) chronic lower back pain (chronic lumbar myofascial pain, possibly superimposed upon some degenerative disc and joint disease); 5) gastroesophageal reflux disease; 6) exogenous obesity; and 7) hypothyroidism. Dr. Beard noted he was unable "to identify end-organ damages related to diabetes"; Plaintiff's lungs were clear to auscultation; Plaintiff had no exertional dyspnea; Plaintiff did not have clubbing or cyanosis;

7

Plaintiff's history "seem[ed] compatible with that of asthma; he was unable to "identify end-organ damage related" to hypertension; Plaintiff had "mild motion loss with symmetric reflexes" related to chronic back pain; Plaintiff had no radiculopathy or myelopathy; and Plaintiff ambulated normally (R. 206).

On March 3, 2003, Joseph Kuzniar, Ed.D., a state-agency licensed psychologist, completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had no medically determinable impairment (R. 208, 222).

On March 4, 2003, Thomas Lauderman, D.O., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Lauderman found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 224). Dr. Lauderman found Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (R. 225-27). Dr. Lauderman reduced Plaintiff's RFC to medium (R. 228).

On April 23, 2003, Plaintiff underwent a pulmonary functional analysis at Davis Memorial Hospital. The test was positive for asthma and sleep apnea. It was noted there was "a minimal obstructive lung defect" (R. 236).

On April 30, 2003, A. Husari, M.D., F.C.C.P., evaluated Plaintiff. Her weight was one-hundred ninety-one pounds and her blood pressure was 143/100. Dr. Husari found Plaintiff's lungs "showed decreased breath sounds in the upper lung fields," her heart had a regular rhythm, her abdomen was soft, and her extremities were negative for edema. Plaintiff's eyes, ears, and musculoskeletal examinations were normal. Dr. Husari found Plaintiff experienced shortness of

8

breath upon examination of her chest (R. 232). Dr. Husari found Plaintiff experienced "excessive daytime somnolence/sleepiness, which [was] secondary to obstructive sleep apnea"; history of hypertension; history of thyroid disease; and history of gastroesophageal reflux disease. Dr. Husari recommended Plaintiff undergo a sleep study (R. 233).

On May 28, 2003, Plaintiff underwent a polysomnography at Davis Sleep Solutions (R. 250).

On June 3, 2003, Dr. Husari corresponded with Dorrene Plank, D.O. He noted in the letter that Plaintiff experienced decreased breath sounds. He noted he had reviewed the polysomnography testing conducted on Plaintiff and that she was positive for obstructive sleep apnea. He recommended Plaintiff proceed with a therapeutic sleep study (R. 249).

On June 4, 2003, Plaintiff underwent a therapeutic sleep study at Davis Sleep Solutions. It was noted in the report that "[o]bstructive sleep apnea was documented in a previous study." Plaintiff's sleep efficiency was noted to be seventy-seven percent with eighteen obstructive apneas. Dr. Husari's impression was for obstructive sleep apnea and excessive daytime somnolence/sleepiness. It was recommended that Plaintiff use a "nasal CPAP machine with pressure of 10." Plaintiff was advised to loose weight, advised to avoid activities that required alertness, and informed that alcohol and/or sedative consumption could worsen condition (R. 256).

On June 17, 2003, Dr. Husari wrote a letter to Dr. Plank relative to Plaintiff's obstructive sleep apnea. He noted Plaintiff showed "significant improvement with the nasal CPAP machine" (R. 246).

On June 19, 2003, Fulvio Franyutti, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand

9

and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 238). Dr. Franyutti found Plaintiff was occasionally limited in her climbing ramps and stairs and should never climb ladders, ropes, or scaffolds. Dr. Franyutti found Plaintiff could frequently balance, stoop, kneel, crouch, and crawl (R. 239). Dr. Franyutti found Plaintiff had no manipulative, visual, or communicative limitations (R. 240-41). Dr. Franyutti opined Plaintiff should avoid concentrated exposure to extreme cold and fumes, odors, dusts, gases, poor ventilation, etc. (R. 241). Dr. Franyutti reduced Plaintiff's RFC to medium (R. 242).

On July 8, 2003, Dr. Husari corresponded with Dr. Plank regarding his follow-up examination of Plaintiff relative to her obstructive sleep apnea. He wrote Plaintiff had reported that she was "feeling much better on nasal CPAP machine. She [was] resting very well and denies any other complaints." Dr. Husari discharged Plaintiff from his care (R. 254).

On October 13, 2003, Dr. Corder completed a Fibromyalgia Residual Functional Capacity Questionnaire of Plaintiff. He wrote Plaintiff met the American College of Rheumatology criteria for fibromyalgia. He noted Plaintiff had been diagnosed with sleep apnea, short-term memory loss, hypertension, fatigue, and headaches. He opined Plaintiff's conditions were chronic and "good with" medications, but may decline with time. He noted it was possible for Plaintiff to enter remissions and have exacerbations of her condition. In response to the instruction for Dr. Corder to "[i]dentify the clinical findings, laboratory and test results that show . . . patient's medical impairment," he wrote, "fatigue, poor sleep patterns, 18/18 tender points, chronic pain 'all over.'" Dr. Corder listed the following symptoms for Plaintiff: multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness and pain, muscle weakness, subjective swelling, frequent and severe headaches, depression, and hypothyroidism (R. 269).

Dr. Corder opined Plaintiff did not "appear to be" a malingerer. Dr. Corder did not offer an opinion as to whether emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations. Instead, he identified himself as Plaintiff's primary care physician and wrote it would be proper to "let mental health professional determine this." Dr. Corder noted Plaintiff's pain was located in her lumbosacral spine, cervical spine, thoracic spine, shoulders bilateral, arms bilateral, hand and fingers bilateral, hips bilateral, legs bilateral, and knees, ankles, and feet bilateral. He wrote Plaintiff reported she experienced pain every day, that she ached all over, and that she realized "'minimal relief of pain" from medications. Dr. Corder noted Plaintiff's pain was precipitated by stress, fatigue, and movement/overuse. He opined Plaintiff's impairment was reasonably consistent with her symptoms and that Plaintiff's pain and other symptoms frequently interfered with her attention and concentration (R. 270).

Dr. Corder opined Plaintiff could walk one city block without rest or experiencing severe pain; Plaintiff could sit for thirty to sixty minutes before needing to stand and stand for thirty to sixty minutes before needing to sit; Plaintiff could sit, stand, and/or walk for less than two hours; Plaintiff needed to walk around for five minutes every thirty to sixty minutes during an eight-hour day; Plaintiff needed to shift positions at will; Plaintiff did not require the use of a cane; and Plaintiff did not need to keep her legs elevated. Dr. Corder did not offer an opinion as to whether Plaintiff needed to take unscheduled breaks, but instead noted Plaintiff needed a "5 minute walk break" and would not have to lie down or sit on a break. Dr. Corder found Plaintiff was capable of low stress jobs (R. 270).

Dr. Corder found the following: Plaintiff could frequently lift and/or carry from less than ten pounds to ten pounds, occasionally lift and/or carry twenty pounds, and never lift and/or carry fifty

11

pounds; Plaintiff could frequently twist, stoop, bend, crouch, squat, climb ladders, and climb stairs; and Plaintiff could frequently look down (sustained flexion of neck), frequently turn head right or left, frequently look up, and occasionally hold head in static position. Dr. Corder opined Plaintiff had no significant limitations with reaching, handling, or fingering. Dr. Corder found Plaintiff would experience good days and bad days and would be absent from work more than four days per month (R. 272).

On December 12, 2003, Plaintiff returned to Dr. Corder with complaints of feeling depressed and sad. Plaintiff stated she "[ran] out of 'steam' fast." Plaintiff informed Dr. Corder she could not peel potatoes. Plaintiff's blood pressure was 120/84 and her weight was 193 pounds. Plaintiff's psychological, skin, HEENT, neck, cardiovascular, lungs, abdomen, extremities, and neurological examinations were all within normal limits. Dr. Corder noted Plaintiff was positive for trigger points in her back. He diagnosed fibromyalgia and depression and prescribed Effexor (R. 287).

On December 18, 2003, Thomas Stein, Ed.D., completed an Adult Mental Profile of Plaintiff for the West Virginia Disability Determination Service. He noted Plaintiff's husband drove her for one and one-quarter hours to the appointment and Plaintiff was cooperative, polite, and subdued. Plaintiff's gait and posture were both "adequate" (R. 273). Plaintiff's chief complaints were as follows: 1) medications made her "'drowsy all the time'"; 2) constant muscle pain caused by fibromyalgia; 3) could not "sit, stand, or walk very much without the pain getting worse"; 4) depended on husband to complete most of the household chores; 5) could not drive due to medicine-induced drowsiness; 6) depressed; 7) could not concentrate; 8) experienced memory problems; 9) experienced tiredness due to a thyroid condition; and 10) asthma interfered with breathing when she overly exerted herself (R. 273-74). Plaintiff informed Dr. Stein she had "lost interest in doing the

12

things . . . she . . . always enjoyed doing" and she did not desire to leave the house. Plaintiff informed Dr. Stein she had been diagnosed with sleep apnea and she was "'irritable and grouchy'" (R. 274).

Plaintiff named the following presenting problems: 1) sleep disturbances; 2) frequent awakenings; 3) daily crying episodes; 4) poor energy level; and 5) "grouchy" mood. Plaintiff denied present suicide ideations, panic attacks, phobias, obsessive thinking, compulsive behaviors, or posttraumatic stress symptoms (R. 274).

Dr. Stein reviewed the March 3, 2003, Psychiatric Review Technique completed by Dr. Kuzniar and the medical disability report completed on February 5, 2003, by Dr. Beard (R. 274).

Dr. Stein noted Plaintiff attended regular classes in school and was an "A" and "B" student. Dr. Stein listed Plaintiff's past employment as a sewing machine operator, from which she voluntarily separated due to pregnancy, and security guard, from which she was "laid off because [she] was sick a lot and missed a bunch of work." He noted Plaintiff was last employed in November 2002 (R. 275).

Dr. Stein opined Plaintiff was "introverted with fair conversational skills." Plaintiff's speech was relevant, coherent, and normally paced; she was well oriented to time, place, person, and date; her mood was moderately depressed; her affect was labile; Plaintiff's thought processes were without disturbances; her thought content was absent of preoccupation, obsessive thinking, and phobias, but positive for delusional guilt thinking; Plaintiff's reality contact was good; her insight was fair; Plaintiff's judgment was poor; she was not a present suicide risk; her immediate memory was moderately deficient; her recent memory was moderately deficient; her remote memory was mildly deficient; and her concentration was average (R. 276).

Plaintiff's Verbal IQ was 91; Performance IQ was 105; and Full Scale IQ was 97 (R. 277). Plaintiff scored the following on the WRAT-3: reading – post high school; spelling – high school; arithmetic – high school (R. 278).

Dr. Stein summarized Plaintiff's subjective symptoms as follows: sleep apnea; chronic muscle pain secondary to fibromyalgia; chronic fatigue secondary to hypothyroid; chronic fatigue caused by prescription pain medications; poor concentration; poor memory; depressed mood; frequent crying spells; guilt feelings; loss of interest. Dr. Stein summarized Plaintiff's objective symptoms as follows: cooperative and polite, but mostly subdued; labile affect; tearful outbursts; moderately depressed; delusional guilt; average concentration; moderately deficient immediate and recent memory; and mildly deficient remote memory (R. 278).

Dr. Stein diagnosed the following: AXIS I – 1) pain disorder associated with general medical condition and psychological factors and 2) major depression, single episode non-psychotic; AXIS II – no diagnosis; AXIS III – fibromyalgia, hypertension, hypothyroid, sleep apnea, and asthma by Plaintiff's report. Dr. Stein opined Plaintiff's prognosis was fair (R. 279).

Plaintiff reported to Dr. Stein that her activities of daily living were as follows: arose at 10:00 a.m., completed personal hygiene, dressed, watched television, prepared and ate light breakfast, talked with spouse, napped, ate, watched more television, walked around house, fixed or assisted husband with dinner preparations, assisted husband with cleaning kitchen, watched television, and retired to bed at 8:30 p.m. Plaintiff informed Dr. Stein that she did not require assistance with her personal hygiene and she did "'some' cooking, cleaning, washing dishes, and laundry." Plaintiff grocery shopped with the assistance of her husband. Plaintiff did not garden or drive. Plaintiff stated she did not have any hobbies, she did not collect anything, she did not hold

membership in any clubs, she did not attend meetings, and she did not attend church, but she occasionally ate in restaurants, occasionally visited with friends and family, and occasionally socialized with neighbors (R. 279).

Dr. Stein opined Plaintiff's concentration was within normal limits, her persistence was mildly deficient, and her pace was very slow (R. 279).

Also on December 18, 2003, Dr. Stein completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) of Plaintiff. He found Plaintiff's ability to understand and remember short, simple instructions; ability to carry out short, simple instructions; and ability to make judgments on simple work-related decisions were not affected by her impairments. Dr. Stein opined Plaintiff's ability to understand, remember, and carry out detailed instructions was slightly affected by her impairment (R. 281). Dr. Stein found Plaintiff was slightly restricted in the following abilities: ability to interact appropriately with the public, supervisor(s), and co-workers; ability to respond appropriately to work pressures in the usual work setting; and ability to respond appropriately to changes in a routine work setting (R. 282).

On January 12, 2004, Plaintiff presented to Dr. Corder with complaints of sinus drainage and cough. Plaintiff's blood pressure was 120/84 and her weight was 189 pounds. Dr. Corder diagnosed acute sinusitis (R. 287).

On February 21, 2004, Dr. Corder completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment. He noted Plaintiff's ability to remember locations and work like procedures and ability to understand and remember very short and simple, repetitive instructions or tasks were markedly limited (R. 283). Dr. Corder found Plaintiff's ability to understand and remember detailed instructions or tasks which may or may not be repetitive was

15

moderately limited. Dr. Corder opined Plaintiff was moderately limited in all areas of "sustained concentration and persistence" and mildly limited in all but one area of "social interaction," that one area being her ability to accept instructions and to respond appropriately to criticism from supervisors, in which he found her moderately limited (R. 283-84). In the area of adaptation, Dr. Corder found the following: Plaintiff was markedly limited in her ability to respond appropriately to expected or unexpected changes in the work setting; moderately limited in her ability to be aware of normal hazards and take appropriate precautions; and mildly limited in her ability to travel in unfamiliar places and/or to use public transportation and the ability to set realistic goals or to make plans independently of others (R. 285).

Dr. Corder found the following work-related stressors would increase the level of Plaintiff's impairments: unruly, demanding, or disagreeable customers; production demands or quotas; demand for precision; and a need to make quick, accurate, independent decisions on a consistent basis (R. 285). Dr. Corder opined Plaintiff would be unable to complete a work day more than three or four times per month. He noted Plaintiff's limitations had lasted or would last for twelve consecutive months. Dr. Corder wrote that a "MRI of brain has significant generalized atrophy – more than should be for age." He referred Plaintiff to a neurologist (R. 286).

At the administrative hearing, held on March 30, 2004, Plaintiff testified she and her husband lived on an 18.8 acre farm, where they raised twenty-two chickens (R. 320-21). Plaintiff stated she assisted her husband with the care of the chickens when she had "a good day" (R. 321). Plaintiff testified she had not driven during the past eight months (R. 322). Plaintiff stated her husband, the elected Sheriff of Randolph County, stayed home with her three to four days per week and went to the office one or two days per week (R. 323). Plaintiff stated she had worked at a clinic doing office

16

work in July 2003 for one to two days per week but had to quit that job because she was "just too tired" (R. 324, 326). Plaintiff testified she became unemployed in November 2002 as a security guard at a construction site because she "was getting sick" and she "miss[ed] a lot of work," which caused her to "find somebody to replace" her. Plaintiff stated she had to pay her substitute and this was "just a hassle." Plaintiff testified she was laid off by her employer to give her time to "get better," but the employer then "hired somebody else" (R. 327-29).

Plaintiff stated the most serious problem that caused her not to be able to work was she had "good days sometimes bad." If Plaintiff had a "bad day," she testified she could "barely get out of bed" (R. 337). Plaintiff defined a "bad day" as being "tired" and not "want[ing] to do anything" (R. 355). Plaintiff stated the CPAP machine helped her sleep better, but the "pain medicines and muscle relaxers and all that" caused her to wake "a couple" times per night (R. 337-38).

Plaintiff testified she did not have to check her blood sugar levels very often because her diabetes was "complete borderline." Plaintiff stated she did not monitor her diet and that she took Glucophage to control her diabetes (R. 338-39). Plaintiff stated she had headaches two or three times weekly and she treated them with Tylenol (R. 357). Plaintiff testified she took pain medication for fibromyalgia symptoms. She stated she experienced pain in her hands and elbows and that the pain rotated. Plaintiff asserted that sometimes she experienced pain in her knees, but most constantly in her arms and lower back (R. 339). Plaintiff stated the pain in her back made her feel as if it were "going to break in two" and that sitting caused the pain to "ease up" (R. 341). Plaintiff asserted her pain was exacerbated by stress and "just doing anything in the amount of time – I don't know" (R. 353).

Plaintiff testified that she did not treat her pain with exercise because it seemed "the more

17

exercise [she did] with [her] arms, the more . . . they hurt" (R. 340). Plaintiff testified that her

doctor had not restricted her activities "in any way" (R. 356). Plaintiff stated her physician informed

her that "all [she could] do [was] take the pain medication, muscle relaxers" (R. 342). Plaintiff

testified that Ultram eased the fibromyalgia pain, but it made her sleepy (R. 343). She stated she

took pain medication four times daily and two at bedtime on a "bad day" (R. 357-58).

Plaintiff testified her activities of daily living included preparing breakfast; cleaning the

house "once in a while, usually when [her] husband [said] don't you think it needs cleaned";

relaxing; sitting on the couch; lying on the couch; and watching television (R. 339, 341). Plaintiff

described a "good day" as preparing breakfast, relaxing on the couch, doing laundry, cleaning the

house, and "fool[ing] with the chickens" (R. 343-44).

Plaintiff testified she had accompanied her husband to his work, which was sixty miles from

her home, because her husband was "afraid to leave [her] by [herself]" due to her sleep apnea (R.

323, 345, 352). She stated her husband took her grocery shopping when she accompanied him to

his job (R. 346). Plaintiff testified she had accompanied her husband to a "Sheriff's meeting,"

which lasted a "couple days," in Charleston, West Virginia, in "February," during which time she

stayed in the hotel room and watched television (R. 349). Plaintiff stated she did not shop because

it was "too stressful to try to walk and stuff" (R. 349-50).

Plaintiff stated she did not seek treatment with a psychologist or a psychiatrist because "[i]t's

just, you know, they're so far away for one thing from where we live. You know it's just – I don't

know how often you have to see one, but I know, I mean, it's just – I don't know." Plaintiff stated

Dr. Corder informed her it was up to her husband and her as to whether she wanted to be treated by

a psychologist or a psychiatrist (R. 350).

At the administrative hearing, the VE testified that Plaintiff's cashier job was classified as a store laborer job in the *Dictionary of Occupational Titles* ("DOT") as light exertional and unskilled, but that Plaintiff had performed that job at the heavy exertional level (R. 378, 382). Plaintiff's past relevant work as shoe sewing machine operator was classified as light exertional, unskilled in the DOT (R. 378, 382). The VE classified Plaintiff's past relevant work as a shoe laborer as medium exertional, unskilled; her past relevant work of nurse's aide as medium exertional, semi skilled; and her past relevant work as a medical assistant as light exertional, skilled work as defined in the DOT (R. 379, 382). The VE classified Plaintiff's past relevant work as a security guard as heavy as performed by Plaintiff and as light exertional as defined in the DOT. The VE classified Plaintiff's past relevant work as a home health aide as medium exertional as defined in the DOT (R. 381).

Upon questioning by the ALJ, the Plaintiff testified she did not drink alcoholic beverages, she did not smoke, she did not use illegal drugs, she did not have "trouble dressing" herself, she paid bills, sat for up to five to six hours per day, lay for one hour per day, and walked no more than two to three hours (R. 380-81).

The following hypothetical questioning/response exchange occurred between the ALJ and the VE:

ALJ: I want you to assume that the Claimant would have the ability to do medium work, wouldn't be able to do jobs that would require more than occasional climbing of ramps or stairs, wouldn't be able to work in extremes of heat or cold, and extremes of cold for long periods of time, wouldn't be able to work in atmospheres of concentrated fumes, odors, dusts, gases for long periods of time. Would she be able to do any of her past relevant work?

VE: Well, customarily as a CNA is performed, yes. Would the sewing machine operator combined with the shoe laborer I wouldn't think so, because there

are fumes involved at times. You have people dying shoes and that does have a noxious odor. And store laborer I would likewise say that you have a possibility of a lot of dust and fumes. Medical assistant would be possible within that exertion. Security guard as customarily performed would be possible. Also the –

ALJ:   Cashier?

VE:   – companion and cashier as customarily performed. And home health aide as customarily performed.

ALJ:   Now, would there be – would she'd [sic] be able to do any of her past work, relevant work, limiting her to light with those non-exertional impairments?

VE:   Well, as customarily performed the position of medical assistant. As sewing machine shoe operator it would be still possible as that alone is customarily performed without those additional restrictions. In addition, the companion as customarily performed. And cashier as customarily performed.

ALJ:   All right. I'm going to ask you another hypothetical. If the Claimant would be limited to sedentary work, would she be able to do any of her past relevant work?

VE:   None of her past relevant jobs, no sir (R. 383-84).

### III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Randall Moon made the following findings:

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of the decision

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.   The claimant's high blood pressure, arthritis, diabetes mellitus, sleep apnea, and fibromyalgia are considered "severe" based on the requirements in Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4.   These medically determinable impairments do not meet or medically equal one of the

20

listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant retains the residual functional capacity to perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting ten pounds; some light jobs are performed while standing, and those performed in the seated position often require the worker to operate hand or leg controls. (20 CFR §§ 404.1576 and 416.967).

7. The claimant's past relevant work as security guard, sewing machine operator, companion, and cashier as customarily performed in the national economy do [sic] not require the performance of work-related activities precluded by the residual functional capacity (20 CFR §§ 404.1565 and 416.965).

8. The claimant's medically determinable high blood pressure, arthritis, diabetes mellitus, sleep apnea, and fibromyalgia do not prevent the claimant from performing past relevant work as performed in the national economy.

9. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision. (20 C.F.R. §§ 404.1520(f) and 416.920(f)) (R. 25-26).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated*

21

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The Commissioner erred as a matter of law by finding that the Plaintiff's major depressive disorder is not a severe impairment.

2. The Commissioner erred as a matter of law by failing to consider all of the Plaintiff's impairments when determining her residual functional capacity.

3. The Commissioner failed as a matter of law by failing to properly evaluate Plaintiff's fibromyalgia.

4. The Commissioner's finding that Plaintiff can perform her past relevant work is not supported by substantial evidence.

   a. The Commissioner improperly relied on the testimony of the vocational expert in concluding that the claimant can return to her past relevant work.

   b. The ALJ failed to properly analyze Plaintiff's ability to return to her past relevant work

The Commissioner contends:

1. Substantial evidence supports the ALJ's finding that Plaintiff could perform her past relevant work.

## C. Severe Impairment

Plaintiff contends Defendant erred by finding Plaintiff's major depressive disorder was not a severe impairment. The Defendant asserts the ALJ properly determined Plaintiff did not have a severe mental impairment.

Specifically, Plaintiff argues that, even though the ALJ made "certain findings regarding the impact . . . [P]laintiff's mental impairments have on her ability to function in the four broad functional areas provided in §§ 404.1520a and 416.920a, those findings are simply not determinative on the issue of severity. The Administration's regulations provide that this analysis will result generally in a conclusion that the claimant's impairment(s) is not severe, [sic] 'unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities.'" 20 C.F.R. §§ 404.1520a (c)(4), 404.1520a (d)(1), and 416.920a. "Thus, the ALJ stopped short in his analysis of the claimant's mental impairments and should have made a determination of whether there is evidence that her mental impairments cause a more than minimal limitation on her ability to do basic work activities." (Plaintiff's brief at pp. 7-8.) Defendant argues the ALJ discussed the evidence of record that indicated that Plaintiff was not more than minimally limited in her ability to do basic work activities.

The ALJ did make a finding, as noted by Plaintiff, that the objective medical showed Plaintiff was mildly limited in her activities of daily living; social functioning; and concentration, persistence, and pace (R. 22). The ALJ also made a finding relative to Plaintiff's work activities. In his decision, he opined "[t]he evidence of record does not appear to indicate any severe exacerbation in the claimant's impairments or symptoms that would reflect the claimant's sudden loss of ability to perform these [work] activities [working about 60 hours a week when doing her security guard job

23

and driving one hour each way to and from work]." The ALJ noted Plaintiff had been "laid off in November 2002 and apparently continued to look for work as she drew unemployment and then found part time work as a medical assistant." Additionally, the ALJ found Plaintiff "was able to testify satisfactorily at the hearing with adequate recall and appropriate responses to questions" (R. 24).

To support this finding regarding Plaintiff's ability to do work activities, the ALJ noted the opinions of state agency physicians, who opined "Plaintiff could perform exertional work or non-exertional work requirements [which] are not grossly restricted" (R. 24). Specifically, on March 3, 2003, Dr. Kuzniar, in completing a Psychiatric Review Technique of Plaintiff, found Plaintiff had no medically determinable impairments (R. 24, 208). The ALJ found this opinion consistent with the majority of the objective findings in the medical evidence.

That objective medical evidence relative to the ALJ's findings as to Plaintiff's ability to do work related activities based on her mental impairment was provided by Dr. Stein. As noted by Plaintiff in her argument, Dr. Stein did make certain findings in his Adult Mental Profile of Plaintiff relative to her mood, judgment, and memory. Specifically, Dr. Stein found Plaintiff's mood was moderately depressed, her thought processes were without disturbances, her insight was fair, her judgment was poor, her immediate memory was moderately deficient, her recent memory was moderately deficient, her remote memory was mildly deficient, her concentration was within normal limits, and her persistence was mildly deficient (R. 276, 279). Dr. Stein then completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) to establish how these limitations affected Plaintiff's ability to do basic work activities. He found Plaintiff's ability to understand and remember short, simple instructions; ability to carry out short, simple instruction;

24

and ability to make judgments on simple work-related decisions were **not** affected by her impairments (emphasis added). Dr. Stein opined Plaintiff's ability to understand, remember, and carry out detailed instructions was **slightly** affected by her impairment (emphasis added) (R. 281). Dr. Stein found Plaintiff was **slightly** restricted in the following abilities: ability to interact appropriately with the public, supervisor(s), and co-workers; ability to respond appropriately to work pressures in the usual work setting; and ability to respond appropriately to changes in a routine work setting (emphasis added) (R. 282). These findings support the ALJ's opinion Plaintiff had no "severe exacerbation . . . would reflect the claimant's sudden loss of ability to perform . . . [work] activities" (R. 24).

Finally, the ALJ considered and evaluated opinions contained in the evidence of record by state agency physicians, a consultative physician, and Plaintiff's own physician that Plaintiff could perform work activities. The ALJ noted state-agency physicians opined on March 4, 2003, and June 19, 2003, that Plaintiff could perform medium work (R. 23, 24, 230, 244). The ALJ addressed Dr. Beard's February 11, 2003, consultative examination of Plaintiff, in which he listed Plaintiff's conditions as chronic cough and wheezing, diabetes, hypertension, chronic lower back pain, gastroesophageal reflux disease, exogenous obesity, and hypothyroidism, but in which he did not offer a restriction as to Plaintiff's ability to work (R. 24, 206). Dr. Corder, Plaintiff's treating physician, opined on August 13, 2003, that she was capable of performing low stress work. This, too, was considered by the ALJ (R. 24, 272).

For the above stated reasons, the undersigned finds the ALJ's findings relative to Plaintiff's severe mental impairment and her ability to perform basic work activities are supported by substantial evidence.

## D. Residual Functional Capacity

Plaintiff argues the ALJ failed to consider any of Plaintiff's non-exertional impairments in determining her RFC. Defendant's only argument relative to the ALJ's RFC is that the ALJ's finding based on the treating physician's "responses on the physical capacities questionnaire is also without merit." (Defendant's brief at p. 14.)

In his decision, the ALJ found the "evidence supports a finding that the claimant has high blood pressure, arthritis, diabetes mellitus, sleep apnea, and fibromyalgia, impairments that are "severe . . . " (R. 22). Additionally, the ALJ found, based on his review of the evidence of record, that Plaintiff had "been diagnosed with pain disorder with depression" and with "possible depression." In conjunction with this finding relative to Plaintiff's medically determinable impairments, the ALJ found Plaintiff's activities of daily living were no more than mildly limited; her social functioning was no more than mildly limited; and her concentration, persistence, and pace were not more than mildly limited (R. 22).

Plaintiff contends that since the ALJ found her arthritis, fibromyalgia, allergies, asthma, diabetes, mellitus, and sleep apnea were severe impairments, they should have been included in the analysis of Plaintiff's RFC. (Plaintiff's brief at p. 9.) Additionally, Plaintiff asserts the ALJ did not consider limitations caused by Plaintiff's medically determinable impairments of depression and pain disorder "when making a determination as to [Plaintiff's] RFC." (Plaintiff's brief at p. 10.)

The ALJ found Plaintiff could "perform work at a light exertional level with no non-exertional limitations" and she had the following RFC:

> Based on all available evidence, the undersigned finds that the claimant retains the residual functional capacity to perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting ten pounds; some light jobs are performed while standing, and those performed in the seated

26

position often require the worker to operate hand or leg controls. (20 C.F.R. §§ 404.1567 and 416.967) (R. 25).

SSR 96-8p, the Policy Interpretation Ruling Titles II and XVI: Assessing Residual

Functional Capacity in Initial Claims, reads as follows:

*Definition of RFC.* RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work- related physical and mental activities.

*The RFC Assessment Must be Based Solely on the Individual's Impairment(s).* The Act requires that an individual's inability to work must result from the individual's physical or mental impairment(s). Therefore, in assessing RFC, the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments.

Likewise, when there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity

The ALJ is required to consider, for the purposes of determining a person's RFC, all exertional and nonexertional limitations caused by Plaintiff's severe and medically determinable impairments, both physical and mental. A review of the ALJ's decision, however, reveals the ALJ did not discuss any non-exertional limitations such as might be caused by Plaintiff's severe impairments of high blood pressure, arthritis, diabetes mellitus, sleep apnea and fibromyalgia or by Plaintiff's medically determinable impairments of pain disorder with depression and possible depression.

In making his decision as to Plaintiff's ability to perform exertional and/or non-exertional work, the ALJ relied on the opinions of the state agencies physicians "to the extent that they show that the [Plaintiff's] ability to perform exertional work or non-exertional work requirements are not

grossly restricted . . ." (R. 24). Dr. Kuzniar, a state agency psychologist, found Plaintiff was not significantly limited due to depression and Dr. Lauderman, a state agency physician, found Plaintiff had no non-exertional limitations; however Dr. Franyutti, a state agency physician, found, based on his review of Plaintiff's records for hypertension, thyroid disease, allergies, acid reflux, asthma, and sleep apnea, that Plaintiff did have some non-exertional limitations (R. 220, 225-28, 237, 239, 241). Specifically, Dr. Franyutti found Plaintiff should never climb ladders, ropes, or scaffolds and could occasionally climb ramps and stairs. Dr. Franyutti also found Plaintiff should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation (R. 239, 241). Inasmuch as Dr. Franyutti's opinions as to Plaintiff's non-exertional limitations do not constitute limitations that are "grossly restricted" and inasmuch as the ALJ relied on the opinions of the state agency physicians, of which Dr. Franyutti was one, the undersigned finds the ALJ erred in not considering Dr. Franyutti's specific findings as to Plaintiff's non-exertional limitations when determining her RFC.

Relative to Plaintiff's medically determinable impairments and the effect they would have on her ability to perform work, Dr. Kuznair found Plaintiff was not significantly limited due to depression, and the ALJ considered, discussed, and accepted that opinion. The ALJ did not, however, discuss non-exertional limitations, if any, that may have been caused by Plaintiff's pain disorder. Based, in part, on his finding that Plaintiff had been diagnosed with pain disorder with depression, the ALJ found Plaintiff was mildly limited in her activities of daily living; mildly limited in social functioning; and mildly limited in her concentration, persistence, and pace (R. 22). Except for the finding that "[o]ther medical opinions indicated that the claimant could not maintain concentration due to pain, but the claimant has . . . indicated that movies are among her hobbies, and

28

. . . other activities she did would appear to support capabilities greater than indicated" by her treating physician, the ALJ's decision contained no discussion of what non-exertional effects, if any, Plaintiff's mild limitations in the areas of activities of daily living, social functioning, and concentration, persistence, and pace had on Plaintiff's ability to perform work (R. 25). Additionally, the ALJ did not discuss, consider, or weigh the opinions of Dr. Stein, who found Plaintiff's immediate memory was moderately deficient; her recent memory was moderately deficient; her remote memory was mildly deficient; her concentration was average, her persistence was mildly deficient, and her pace was very slow, and address what extent, if any, these non-exertional limitations impacted Plaintiff's ability to perform work (R. 276, 279).

For the above stated reasons, the undersigned finds the ALJ's determination as to Plaintiff's RFC is not supported by substantial evidence.

### E. Fibromyalgia

Plaintiff asserts that 1) the ALJ erred in finding Plaintiff's treating physician failed to "'cite the findings or objective test results that support the finding'" of fibromyalgia and that 2) the opinion of Plaintiff's treating physician was "inconsistent with the claimant's testimony as to her . . . functional capabilities" are "unsupportable." (Plaintiff's brief at p. 10.)

In her argument that Dr. Corder supported his diagnosis of fibromyalgia with objective test results or laboratory findings, the Plaintiff points to SSR 99-2p, that regulation that establishes the criteria for evaluating cases involving Chronic Fatigue Syndrome (CFS). Plaintiff, in her argument, relied on SSR 99-2p Footnote 3, which is relevant to language in the Regulation regarding "persistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points." Footnote 3 reads as follows: "There is considerable overlap of symptoms

between CFS and Fibromyalgia Syndrome, but individuals with CFS who have tender points have a medically determinable impairment. Individuals with impairments that fulfill the American College of Rheumatology criteria for FMS . . . may also fulfill the criteria for CFS. However, individuals with CFS who do not have the specified number of tender points to establish FMS, will still be found to have a medically determinable impairment." Footnote 3 distinguishes what qualified CFS as a medically determinable impairment; it does not mandate that the criteria for establishing whether an individual has fibromyalgia is the same as the criteria for establishing whether one has CFS.

In relying on the assumption that SSR 99-2p applies to evaluating cases involving fibromyalgia as well as CFS, Plaintiff then asserts "Dr. Corder's medical records and his opinions clearly provide laboratory findings contained in SSR 99-2p," namely an abnormal sleep study, a laboratory finding that can be used to establish the existence of CFS. (Plaintiff's brief at p. 11.) This argument fails because 1) an abnormal sleep study can be used to establish the medically determinable impairment of CFS, not fibromyalgia; and 2) in the Fibromyalgia Residual Functional Capacity Questionnaire Dr. Corder completed on October 13, 2003, he did not even rely on the abnormal sleep study in making his diagnosis; instead, he relied on Plaintiff's subjective complaints of pain "all over," fatigue, poor sleep patterns, and the presence of tender points (R. 269). The ALJ, therefore, did not err in the consideration and weight he gave to Dr. Corder's opinion regarding Plaintiff's fibromyalgia and his decision was supported by substantial evidence.

Additionally, Plaintiff argues the ALJ dismissed Plaintiff's treating physician's opinions because they were not consistent with the other evidence of record. Specifically, Plaintiff asserts the ALJ erred in finding Dr. Corder's opinion inconsistent with the testimony of Plaintiff in that the

ALJ "accuse[d] [Plaintiff's] treating physician of exaggerating the restrictions caused by her impairments because they appear to [sic] inconsistent with . . . [P]laintiff's testimony . . . ." (Plaintiff's brief at pp. 11-12.) In his decision, the ALJ discussed Dr. Corder's findings that Plaintiff "would be unable to stand/walk for more than 30 minutes, [sic] or lift more than 20 pounds occasionally." The ALJ, in assigning less weight to this opinion, noted Plaintiff had "consistently indicated . . . that her daily activities would allow more physical activities than" Dr. Corder found she could perform, including "cleaning, cooking, and car[ing] [for] her personal hygiene" (R. 25). Specifically, during his credibility analysis of Plaintiff, the ALJ noted "she consistently indicated that she is capable of performing many usual daily activities including maintaining her hygiene, cleaning and vacuuming her hose [sic], cooking, and doing dishes, and shopping" (R. 24). Plaintiff argues it was "absurd[]" for the ALJ to rely on testimony with which he discredited Plaintiff's credibility to assign less weight to her treating physician. The ALJ, in his credibility analysis of Plaintiff, did not, as alleged by Plaintiff, accuse Plaintiff of "lying" about what she could do and then use that information to "accuse[] her treating physician of exaggerating the restrictions caused by her impairments . . . ." (Plaintiff's brief at pp. 12.) In his credibility analysis of Plaintiff, the ALJ weighed her daily activities against her work activities; in his weight assignment to Dr. Corder, he noted inconsistencies in what Plaintiff said she could do and what her doctor said she could do (R. 24-25).

Regardless of Plaintiff's argument that the ALJ's finding as to the limitations found by Dr. Corder are "absurd[]," because they were inconsistent with the testimony of Plaintiff and that the ALJ failed to give proper weight to the opinion of Plaintiff's treating physician, the ALJ is entitled to so find. In *Craig v. Chater*, 76 F.3d 585, 590(1996), the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> [4,5] By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

Even though the ALJ, in his decision, discussed the inconsistency between the opinions of Dr. Corder and Plaintiff's testimony, the ALJ also considered and relied on the opinions of the state agency physicians (R. 24). Dr. Corder's opinion was inconsistent with those opinions. Additionally, there was no clinical evidence to support Dr. Corder's finding as to Plaintiff's limitations. As he noted in his completed Fibromyalgia Residual Functional Capacity Questionnaire, he based his findings on Plaintiff's statements that she experienced pain "all over," was fatigued, had poor sleep patterns and the presence of tender points.

The undersigned, therefore, finds the ALJ's decisions relative to Plaintiff's fibromyalgia are supported by substantial evidence.

### F. Past Relevant Work

Plaintiff contends Defendant improperly relied on the testimony of the vocational expert in concluding that the claimant can return to her past relevant work. 20 C.F.R. 404.1560(b)(2) provides as follows:

[The ALJ] may use the services of vocational experts or vocational specialists, or

other resources, such as the "Dictionary of Occupational Titles" and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity. A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy. Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work. In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

At the administrative hearing, the VE testified relative to Plaintiff's past relevant work as cashier, a sewing machine operator, shoe laborer, medical assistant, security guard, home health aide, and nurse's aide (R. 378-382, 383-84). During that testimony, the VE relied on the DOT to answer the ALJ's questions and provide pertinent information about job classifications and Plaintiff's past relevant work. Additionally, the VE answered hypothetical questions posed to him by the ALJ. This was done in conformance with 20 C.F.R. 404.1560(b)(2).

Plaintiff also contends the ALJ failed to properly analyze Plaintiff's ability to return to her past relevant work. Defendant contends the VE testified as to the exertional requirements of the jobs both as Plaintiff performed them as they are generally performed.

At the administrative hearing, the VE testified as followed: Plaintiff performed the job of cashier at the heavy exertional level, but it was classified in the DOT as light (R. 378, 382); Plaintiff performed the job of sewing machine operator (in combination with shoe laborer) as medium exertional, but it was classified in the DOT as light (378-79); Plaintiff performed the job of security guard at the heavy exertional level, but it was classified in the DOT as light (R. 381); and Plaintiff performed the job of companion at the medium exertional level, but it was classified in the DOT as

light (R. 382). In his decision, the ALJ found the following:

> The evidence in this case established that the claimant has past relevant work as a security guard, sewing machine operator, companion, medical assistant and cashier all of which in the national economy are customarily performed at the light exertional level, according to the Dictionary of Occupational Titles. Such work is also semi-skilled. The claimant can perform work at a light exertional level, with no non-exertional limitations. Thus the claimant can perform her past relevant as it is customarily performed in the national economy (R. 25).

In support of her assertion that the ALJ failed to properly analyze her past relevant work, Plaintiff relies on *DeLoatche v. Heckler*, 715 F.2d 148, 158 (1983), in which the Fourth Circuit held "the Secretary may rely on the general job categories of the *Dictionary* as presumptively applicable to a claimant's prior work. The same label, however, may be used in a variety of ways. The fact that the claimant's former employer labeled the claimant's job that of a 'school social worker' does not prove that the claimant was engaged in the occupation the *Dictionary*, or some other administrative categorization system, labels as 'school social worker' and identifies as sedentary. The claimant may overcome the presumption that the Secretary's generalization applies by demonstrating that her duties were not those envisaged by the framers of the Secretary's category." In the instant case, however, the ALJ did not rely on "labels" to determine Plaintiff could return to her past relevant work. The ALJ relied on one of three possible "tests" as provided in SSR 82-61.

"The purpose" of SSR 82-61 is "[t]o clarify . . . whether a claimant can perform his or her past relevant work, i.e., whether the claimant retains the residual functional capacity (RFC) to perform the physical and mental demands of the kind of work he or she has done in the past. . . . Three possible tests for determining whether or not a claimant retains the capacity to perform his or her past relevant work are as follows:

34

. . .

3.     Whether the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy. (The *Dictionary of Occupational Titles* [DOT] descriptions can be relied upon – for jobs that are listed in the DOT – to define the job as it is <u>usually</u> performed in the national economy.) It is understood that some individual jobs may require somewhat more or less exertion than the DOT description. A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

As noted above, the ALJ questioned the VE about Plaintiff's performance of her past relevant work and how that work was classified in the DOT. The VE testified that Plaintiff performed her past relevant work with more exertion than listed in the DOT, but he testified that the exertional levels for Plaintiff's past relevant work of security guard, sewing machine operator, companion, and cashier as usually performed in the national economy were classified as light. In conformance with the language contained in SSR 82-61, the ALJ "determined that [Plaintiff] retain[ed] the RFC to perform . . . 2. [T]he functional demands and job duties of the occupation as generally required by employers throughout the national economy"; specifically, he found Plaintiff could "perform her past relevant as it is customarily performed in the national economy" (R. 25). The undersigned finds, therefore, the ALJ's analysis of Plaintiff's past relative work comports with the language of SSR 82-61.

The undersigned finds the ALJ's decision that Plaintiff could return to her past relevant work is supported by substantial evidence.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is not supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED, in part**, by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _13_ day of July, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE